## Bolen Pender v. The State.

Legal Holidays.— The statute prescribing legal holidays does not have the effect to suspend proceedings of the courts on those days, but in relation to all judicial proceedings is merely permissive, authorizing the courts, if they see proper, to observe such days.

Appeal from the District Court of Lamar. Tried below before the Hon. R. R. Gaines.

The indictment charged the murder of John Snow. The conviction was for murder in the second degree, with a term of fifty years in the penitentiary awarded as punishment.

W. Coward was the first witness introduced on the part of the State. He testified that, in the year 1880, he knew the defendant and Newton Pender, and was an inmate of Newton Pender's house during that year. He saw the defendant and Newton Pender at the latter's house on the evening before their difficulty with Snow. They had two pistols and a gun on the bed. That night the witness went down to Mrs. Hensley's, about 200 yards distant, and while there John Snow, the deceased, called on a visit to Mrs. Hensley's daughter. The witness lay down on a bed and went to sleep. He was awakened some time during the night by the report of a gun or pistol, and heard a voice, which he recognized as that of the defendant, swearing about something. He heard John Snow tell the defendant that he would see him in the morning. The defendant said: "I have not bothered you, John." The deceased replied: "I think you did when you shot off that pistol."

On the morning of the difficulty, July 31, 1880, the witness ate breakfast with the Pender boys, but heard them say nothing about the Snow boys. After breakfast he saw the Pender boys working with two pistols and a gun, evidently loading them; but they did not say

what they intended doing. Some time later the witness heard the report of a gun in the direction of Mose Reynolds's house, some 200 or 300 yards west, and up the river from where Newton Pender lived. The witness saw John Snow after he was dead. On the Wednesday or Thursday before the killing, which occurred on Saturday, the witness heard Newton Pender say that he was going to his father's, and he and his wife left. When he returned, the defendant came with him, but his wife did not. The witness saw no more of Newton's wife until after the killing. On cross-examination this witness stated that, until the killing, the Snow boys went by the name of Palmer, but he had heard them called Snow before that time.

Ed Snow, for the prosecution, testified that he and the deceased were brothers. He was present on the morning of the killing. Himself and the deceased had gone down to the Mose Reynolds place, about 200 or 300 yards west from where Newton Pender lived. When they arrived at the house, no one but Mose Reynolds and his family, and some boys playing marbles in the yard, were about the place. Reynolds was just starting to his field in the direction of the Newton Pender house, and the witness and his brother, the deceased, requested him to tell the Pender boys to come to his, Reynolds's, house, for deceased to have a settlement with them. In a short time the Pender boys came up to where the witness and the deceased were standing, about twenty steps from Reynolds's house and near a wagon. The witness was standing near the hind wheel of the wagon, and the deceased near the front wheel, when the Penders arrived. All the parties spoke friendly. The defendant took his position in front of the deceased, and Newton his rather in front of the witness. The defendant had a three or four-foot shot-gun, with the breech under his arm, and the muzzle pointing down. John Snow asked the de-

fendant if they had come to settle the pony matter. The defendant answered, "Yes." The deceased, who was standing at that time against the wagon wheel with one foot on it, in his shirt sleeves, and with the fingers of his right hand in his shirt bosom, said: "Well, I guess you will put your gun down, to settle." The defendant answered: "No, by G—d, I won't." Newton Pender then spoke to the deceased and said: "Don't you draw those brass knucks; if you do, I will shoot your G—d d—d heart out of you." At this juncture the defendant threw his gun down on the deceased, and said: "G—d d—n you, have you got a pair of brass knucks out on me?" As the gun was presented, the deceased threw out his hand to grab the gun, and at that instant the gun was fired. As the deceased staggered and was falling, the witness ran forward to catch him. The defendant threw his gun down on the witness, and the witness fell to his knees, asking the defendant not to shoot him. At this moment the witness noticed that Newton Pender was saying something and that he had a pistol in his hand. The witness was much excited, and could not tell exactly what happened after the shooting. He was positive that Newton had one pistol in his hand. Witness saw him draw it, just as the defendant threw down his gun to shoot. He may have had two pistols drawn, but the witness could not so testify.

The deceased was shot in the breast, and died within a few minutes from the effect of the wound. He had no brass knucks or other weapon about his person at the time of the shooting. Any one could see his hands at the time, and that he had nothing in them. Neither the deceased nor the witness had any expectation of a difficulty with the Pender boys on that morning. In explanation of the name of Palmer, by which the witness and deceased were known, the witness stated that their father's name was Snow, but that he died when they

were quite young, and their mother married a man named Palmer; by which name they had since been often called.

On cross-examination the witness said that he and the deceased had settled up all of their business except the pony matter with the Pender boys, and intended after that settlement to leave Texas for north Arkansas. The night before the killing they spent at W. P. Garner's, and slept with his son James, distant two miles and east from Newton Pender's. Two roads lead from Garner's to the ferry across Red River at Mose Reynolds's place; the most direct of which leads by the Newton Pender place. The other is the most traveled and does not lead near the Pender place, and is the one traveled that morning by the witness and the deceased. The witness and the deceased made no preparations to leave Texas before going to the Reynolds place. The witness had no stick or club in his hand at any time just before or during the difficulty, nor did he hear the deceased say anything about killing or whipping the defendant before the shooting. While Reynolds was gone after the Pender boys, Christian and Gilleland came up to the house and engaged in a game of marbles. Robert Harkness came to the house with the Pender boys. Besides the witness, his brother and the Pender boys, there were present at the time of the killing Reynolds, his wife and daughter, Christian, Gilleland and Harkness.

Mose Reynolds testified, for the State, that he lived in Lamar county, Texas, on Red River, and that he knew John and Ed Snow and Newton and Bolen Pender. On the morning of the last day of July, 1880, a hog got into his field, and he was after it when John and Ed Snow rode up, and asked him to tell the Pender boys to come up to his, witness's, house. The witness went and told the Pender boys that the Snow boys wanted to see them and settle the pony matter. The Pender boys went up to

where he left the Snow boys at the house, the defendant
carrying a double-barreled shot-gun, and Newton Pender
two six shooters. Robert Harkness, who was staying
with Newton Pender, accompanied the Pender boys. The
witness was still after the hog, and did not see or hear
what passed between the parties when they first met. He
first heard the defendant tell the deceased not to draw a
pair of brass knucks on him, and then both defendant
and Newton said: "If you draw those brass knucks,
we will shoot your G—d d—d heart out." About the
same instant the gun fired. The witness saw the deceased
reach out his hand as though to grab the defendant or the
gun. At that time the defendant and deceased were fac-
ing each other near a wagon-wheel, and about the length
of the gun apart. Newton Pender was in front of Ed
Snow, near another wheel. The witness did not see New-
ton Pender do anything until after the gun fired, when
he pulled out his pistols, and, waving them over his head,
said: "No one shall interfere with Bolen." The defend-
ant then said: "Now, by G—d, we have done what we
come to do. I said that if I come up here to settle this
matter, that I would shoot some man's G—d d—d heart
out of him, and I have done it." He then reloaded his
gun. Newton Pender then said: "Bolen, let's go," and
the two ran off north through the field towards their
father's, H. C. Pender's. Since then the witness has not
seen them until during this trial.

Cross-examined, the witness said that when the Pender
boys came up to the Snow boys, the deceased was stand-
ing near the front wheel of a wagon, with his right hand
in his bosom, and Ed Snow was standing near a hind
wheel with a hoe-handle in his hand.

Mrs. Reynolds corroborated in every particular the tes-
timony of her husband.

William Gilleland, for the State, testified that during
June, 1880, Hugh and Bolen Pender came to him where

he was plowing in a field and engaged him in conversation, during which Bolen, the defendant, said that if John Snow did not give up Newton's pony, he would whip or kill him. He, the defendant, took a pistol out of his pocket and said that if John Snow resisted he would use that on him.

C. C. Christian, for the State, testified that about February, 1880, Newton Pender came to his house and there met the deceased, and wanted to borrow ten dollars from him, offering to give a lien on his pony to secure the payment. The deceased let Newton Pender have the money, and the witness drew up a bill of sale for the pony from Pender to the deceased. The agreement was that the pony was to be returned if the money was repaid in a short time, about the middle of March, 1880. Newton Pender then left the pony in the possession of the deceased.

The witness was present at the difficulty and stated in substance what was stated by Ed Snow, except that he did not hear what passed between the parties before the shooting. The witness assisted in dressing the deceased. At the time he was shot he had on no clothing except shirt, pants and boots. He had no weapons about his person.

Robert Stewart testified for the State that, about ten or fifteen days before the killing, he sold the defendant a double-barreled shot-gun, the barrels of which were not over two feet in length.

The defendant first introduced the deposition of Robert E. Harkness. The answers to the interrogatories are as follows: "My age is thirty-one years, my residence Yell county, Arkansas. I was acquainted with John and Ed Palmer, and with Bolen and Newton Pender. I knew them all from about February 15, 1880, until July 31, 1880, in Lamar county, Texas. John Snow went by the name of John Palmer in the settlement where he lived, but I

ascertained after his death that his name was John W. Snow. I never saw him write or sign his name that I can now remember.

"I was present on or about the 31st day of July, 1880, in Lamar county, Texas, where a difficulty took place between Newton and Bolen Pender and the said John Snow or John Palmer. There were also present Ed Snow or Ed Palmer, the brother of the deceased, Wm. Gilleland, Christian and two negroes, one named Mose Reynolds, and there may have been others present whom I do not now remember. When the said Newton and Bolen Pender and the said John and Ed Snow first met on the morning of the difficulty, John Snow first spoke to Bolen Pender and said: 'Bolen, I see you have your gun.' Bolen said: 'Yes, I always carry it.' John Snow then said to Bolen Pender: 'If you will lay down your gun, I will give you the d—dest whipping ever a man toated. Bolen said he would not fight him a fair fight. John Snow then made a step or two towards Bolen Pender, who made a step or two backwards and cocked his gun, and put the breech under his arm with the muzzle pointing towards John Snow. Newton Pender then spoke and said: 'John, don't you hit him (referring to Bolen Pender) with those brass knucks.' Bolen then said: 'D—n you, have you got a pair of brass knucks out on me?'" at the same time stepping back a step or two. John Snow then jumped towards Bolen Pender as though he aimed to catch hold of his gun-barrel, when Bolen Pender fired, striking John Snow in the left side.

"On the night before the difficulty Bolen Pender and I went to the house of Mrs. Hensley, a widow lady living two or three hundred yards from the Pender house, and I peeped through a crack in the house and saw John Snow talking to Mrs. Hensley's daughter. I said to Bolen Pender: 'Let us go back and not disturb John,' and, as we turned to leave, Bolen fired off a pistol. John Snow

asked the girl if she knew who it was, and the girl said she thought it was Bolen Pender. John Snow then said something to the girl as though he was bemeaning Bolen for firing off the pistol. Bolen then said: 'John, I have not bothered you.' John said: 'I think you did when you fired that pistol. I will see you in the morning.'

"John Snow never told me at any time that he intended to kill the Pender boys. Ed Snow did not say or do anything until after John was shot, when he picked up a hoe-handle and ran on to Bolen Pender, who cocked the other barrel of his gun, and presented it towards Ed, who stopped and fell to his knees.

"At the time of the difficulty John Snow did not put his hand in his coat-pocket and advance towards Bolen Pender. He did not have on a coat. He placed his hands on his sides when he advanced towards Bolen Pender, who said: 'D—n you, have you got a pair of brass knucks out on me?' at the same time stepping back a step or two. John Snow then jumped towards Bolen Pender as though he intended to catch hold of his gun-barrel, when Bolen fired. John Snow did not strike at Bolen Pender, but only grabbed at his gun. I do not know what the difficulty was about, unless it grew out of the circumstances which occurred at Mrs. Hensley's the night before. I was some eight or ten steps from John Snow during the difficulty, and a little further from Bolen Pender, and don't know who was the nearest person to them. When the difficulty commenced, Bolen Pender and John Snow were five or six feet apart. When the gun fired John was not more than three feet from the muzzle. When they first met John Snow was leaning against the front wheel of a wagon, and Bolen came up in front of him within five or six feet and stopped, when Snow spoke about Pender having his gun. Ed Snow was standing by the hind wheel of the wagon, next to his brother. Newton Pender was about five feet from Bolen and facing Ed

Snow. I do not know anything about the Snow boys sending for the Pender boys. I consider that John Snow, *alias* John Palmer, was a peaceable and quiet man, and not a quarrelsome, dangerous man. Such was his character so far as I know."

In answer to cross interrogatories, the witness said: "I left Texas immediately after the killing of Snow because I was ready to leave, and from the further fact that they were trying to wring me into it because I happened to be with the Pender boys when the difficulty took place. I heard no threats made by John Snow against the Pender boys, at any time."

Hugh Pender, defendant's brother, testified that about the 15th day of July, 1880, at a barbecue in Lamar county, the deceased took the witness off into the woods some distance from the barbecue grounds, and there drew out and exhibited to witness a pair of brass knucks and cursed the witness. He accused the witness of having talked about him, which the witness denied. The deceased then said to the witness that the defendant had been talking about him, had called him a son of a b—h, and that he would whip or kill the defendant before the first of August. This interview the witness communicated to the defendant. The witness was present when the defendant and Wm. Gilleland had a conversation in the field in April or May, 1880. Nothing was then said about a pony. The defendant had a pistol and told Gilleland that the deceased had been talking about his mother, and that he had to take back what he had said or he would make him do it. He took out his pistol during this conversation.

Cross-examined, the witness stated that he and the deceased had always been friendly, and if the defendant and the deceased had ever had a difficulty before the latter drew the brass knucks on the former, the witness did not know it. The witness had told no one of the

hard words between the defendant and himself at the barbecue.

H. C. Pender, defendant's father, testified that the defendant had owned the shot-gun used in the difficulty for two months prior to the killing, and had used it during that time in general hunting.

On cross-examination, this witness stated that on the Wednesday or Thursday before the deceased was killed, Newton Pender and his wife came to his house, and on Friday Newton and the defendant left, saying they were going to Newton's house. Newton left his wife at the witness's house. They took the double-barreled shot-gun with them, and never returned to the witness's house. They were arrested in Red River county, at the house of a cousin.

No brief for the appellant has reached the Reporters.

*Horace Chilton*, Assistant Attorney General, for the State.

WILLSON, J. Appellant was convicted of murder in the second degree, and his punishment was assessed at fifty years' confinement in the penitentiary. The indictment is in due form, the evidence is full and conclusive, and the charge of the court is free of error, presenting to the jury all the law of the case, as favorably to the appellant as the facts warranted.

Upon the trial appellant offered to prove by one John Pender, his brother, a certain conversation which he, the said John Pender, had with deceased some time before the homicide, in regard to a pony, the same pony which in part was the cause of the difficulty. between appellant and deceased. The evidence was objected to by the State, and was rejected by the court, and the appellant excepted. We think the evidence was immaterial and irrelevant, and that it was properly rejected.

The case was tried on a legal holiday, the 21st day of April, and appellant assigns this as error. It was settled by this court in *Dunlap* v. *State*, 9 Texas Ct. App. 179, that article 2835, Rev. Stats., prescribing legal holidays, does not have the effect to suspend the proceedings of the courts on those days. That statute, in relation to all judicial proceedings, is merely permissive, allowing the courts to observe those holidays if they see proper to do so. We find no error in the proceedings and judgment of the court below, and the judgment is affirmed.

*Affirmed.*